Morris John **SUMRALL**, as the legal
representative of his daughter,
Angeline Sumrall, Petitioner,

v.

**SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.**

No. 90–135 V.

United States Claims Court.

April 17, 1991.

Curtis R. Webb, Twin Falls, Idaho, for
petitioner.

David L. Terzian, with whom were Stuart
M. Gerson, Asst. Atty. Gen., Helene M.
Goldberg and John Lodge Euler, Washington, D.C., for respondent.

OPINION AND ORDER

TURNER, Judge.

Respondent seeks review of the special master's January 10, 1991 decision recommending an award of compensation to petitioner for injuries suffered by his daughter Angeline (Angel) as a result of a diphtheria-pertussis-tetanus (DPT) vaccine. Stated broadly, the issue for review is whether the special master properly concluded that petitioner established by a preponderance of the evidence that Angel's seizure disorder, which first manifested itself more than three days after vaccination, was caused by the vaccine. For the reasons given below, we conclude that the special master's decision on the causation issue was not arbitrary or otherwise unlawful, and the decision will be sustained.

I

The facts relating to the onset of Angel's seizure disorder and her current condition were stated succinctly by the special master and are not in dispute:

Angel Sumrall was born February 28, 1985, the product of an uncomplicated pregnancy, labor, and delivery. She was healthy and developed normally through the age of two months.

On May 2, 1985, Angel received her first DPT vaccination. On May 7, 1985, five days after the shot, she suffered a focal motor seizure involving her right hand and two grand mal seizures. Evaluations during [the ensuing] hospitalization failed to reveal a specific underlying cause of the seizures. Within a few weeks, Angel developed myoclonic sei-

zures and an abnormal EEG [electroencephalogram] consistent with hypsarrhythmia, a pattern consistent with a syndrome described by her doctors as 'infantile spasms.' Treatment with ACTH [a drug to control seizures] was begun but subsequently discontinued because of hypertension side effects, and until January, 1989, medications failed to control her seizure activity.

Angel will be six years old in February, 1991. She began to respond positively to valporic acid, an anticonvulsant medication, and since January, 1989, her seizures have been described as 'light and rare.' Angel presently suffers profound developmental delay.

*Sumrall v. Secretary of the Dep't of Health and Human Serv.*, No. 90–135 V, 1991 WL 20074 (Cl.Ct. Sp. Mast. Jan. 10, 1991), slip op. at 2–3.[1]

## II

Under 42 U.S.C. § 300aa–11(c)(1)(C)(i), in conjunction with the table set forth in section 300aa–14(a), a residual seizure disorder first manifesting itself within three days of DPT vaccination is presumed to have been caused by the vaccine. *See* Vaccine Injury Table, section 300aa–14(a), line I.D. However, because Angel Sumrall's seizure disorder first manifested itself five days after her DPT vaccination, petitioner did not enjoy a presumption of causation. Instead, petitioner proceeded under section 300aa–11(c)(1)(C)(ii)(II), which allows for compensation for conditions or injuries listed in the Vaccine Injury Table first occurring after the time period set forth in the Table, if such injury or condition was caused by the vaccination. Petitioner was therefore required to demonstrate by a preponderance of the evidence that Angel's seizure disorder was caused by the May 2, 1985 DPT vaccination, 42 U.S.C. § 300aa–13(a)(1)(A), and the government bore the burden of showing by a preponderance of the evidence that Angel's seizure disorder was due to factors unrelated to the May 2, 1985 administration of DPT vaccine, 42 U.S.C. § 300aa–13(a)(1)(B). *See Matthews v. Secretary of the Dep't of Health and Human Serv.*, 18 Cl.Ct. 514, 518–19 (1989) (discussing allocation of burdens of proof in an action under National Vaccine Injury Compensation Program).

## III

At the hearing before the special master, there was sharp disagreement between the parties' expert witnesses on the issue of whether the May 2, 1985 DPT vaccination caused Angel's seizure disorder. More precisely, the experts disagreed as to what kind of evidence was sufficient to establish causation.

Petitioner's expert, Mark R. Geier, holds an M.D. and a Ph.D. in genetics. He served a one-year residency in obstetrics and gynecology, taught genetics and obstetrics at Johns Hopkins University for several years, and spent nine years at the National Institutes of Health (NIH) researching the effects of bacteria and other molecules on higher organisms. While at NIH, Dr. Geier and his colleagues accidentally discovered that commercial vaccines, including DPT, contained harmful endotoxins. Dr. Geier went on to develop a theory as to how endotoxins in DPT could cause neurological injury, but this theory has not been published or subjected to peer review. For the past ten years Dr. Geier has run a private practice in the field of obstetrical genetics, offering genetic counseling services to parents and would-be parents. Dr. Geier has published numerous articles in medical journals, and estimated that he has spent thousands of hours reviewing medical literature on the subject of vaccine-related injuries.

Dr. Geier never examined or treated Angel, has never treated a seizure disorder, and cannot read an EEG, a CT scan, or a magnetic resonance image. Accordingly, the government asserted that Dr. Geier was not competent to offer an opinion on whether Angel's seizure disorder was caused by the May 2, 1985 DPT vaccination. The special master allowed Dr. Geier to testify concerning causation of Angel's seizure disorder based on his extensive re-

---

**1.** The special master's decision will be cited as "SMD at ___."

view of studies on vaccine-related injuries and his review of Angel's medical records.

Dr. Geier testified that if a neurologically intact child has seizures within seven days of a DPT vaccination, and if there is no known alternative cause, then it is more likely than not that the seizures were caused by the vaccine. For his opinion, Dr. Geier relied heavily on the National Childhood Encephalopathy Study (NCES) conducted in Great Britain in the late 1970s. The NCES studied 1000 children with seizure disorders and other neurological problems in an attempt to determine whether there was a link between the neurological problems and DPT vaccination. The authors of the NCES found that it was four times more likely that a child with given neurological disorders had had a DPT vaccination within the seven day period preceding the onset of the disorder than would have been expected if the association was random; such an association was statistically significant. The NCES concluded that if a previously normal child suffered a neurological disorder (of which seizure disorders are a subset) within seven days of receiving a DPT vaccine, then it was more likely than not, in the absence of an alternative explanation (such as a known trauma), that the DPT vaccine caused the disorder. The NCES did not discuss endotoxins in vaccines, nor did it propose a mechanism by which DPT causes neurological injury.

The government's expert, Daniel L. Hurst, M.D., is a licensed, practicing child neurologist who has published many articles in medical journals. He testified that Angel's seizure disorder was cryptogenic, *i.e.*, of unknown origin. Dr. Hurst criticized the NCES on several grounds, asserting that the statistics gathered by the NCES authors—relying on temporal relationships for an inference of causation—have been misinterpreted. Dr. Hurst also stated that the American Academy of Pediatrics and the Child Neurology Society take the position that DPT vaccines do not cause neurological injury.

## IV

After summarizing the positions of the parties and the evidence presented, the special master concluded:

> For the following reasons, the court concludes that petitioner has met his burden of proof and has demonstrated a logical sequence of cause and effect between the vaccination and Angel's seizure disorder. It has been established by competent medical opinion that DPT contains toxins and endotoxins that can cause neurological damage including seizure disorders. While the onset of the seizure disorder did not occur within the time frame specified on the [Vaccine Injury Table], it was manifested within a reasonable time frame, that is, within 7 days, a period which has been shown to be statistically significant by a reliable statistical study subject to widespread peer review in medical literature. Intensive testing eliminated all other possible causes other than the DPT shot administered on May 2, 1985.

SMD at 8. The special master found that the rest of the statutory requirements for awarding compensation had been met, and awarded compensation.[2]

## V

The standard for reviewing a special master's decision is narrow. 42 U.S.C.A. § 300aa–12(e)(2) (West Supp.1990) provides:

> Upon the filing of a motion [for review of a special master's decision], the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—
>
> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

2. The government does not challenge the quantum of the award.

(C) remand the petition to the special master for further action in accordance with the court's direction.

█ In light of the foregoing, it is not the province of a reviewing judge to conduct a *de novo* review. *See Hines v. Secretary of the Dep't of Health and Human Serv.,* 21 Cl.Ct. 634, 638 (1990) (when reviewing a decision of the special master under the arbitrary and capricious standard, the Claims Court is not to substitute its judgment for that of the special master). The special master observed and weighed extensive and conflicting testimony from expert witnesses. While there is evidence in the record that would support a contrary conclusion, the special master's decision must be upheld if there is a rational connection between the evidence presented and the conclusion reached. *Cf. Consolo v. Federal Maritime Comm.,* 383 U.S. 607, 618–21, 86 S.Ct. 1018, 1025–27, 16 L.Ed.2d 131 (1966) (even under the substantial evidence standard of review, which requires less deference to the decisionmaker than does the arbitrary and capricious standard, the decisionmaker's conclusion must be upheld even if there is evidence in the record that would lead to a contrary result, so long as there is substantial evidence to support the result reached).

## VI

█ The government has raised five objections to the special master's decision: (i) petitioner has not met his burden of showing by a preponderance of the evidence that the May 2, 1985 DPT vaccine caused Angel's injuries;[3] (ii) Dr. Geier's testimony was flawed, in that he testified to matters beyond the scope of his expertise, namely, the neurological effect that the May 2, 1985 vaccination had on Angel; (iii) the studies upon which Dr. Geier based his opinion have been widely refuted by the medical community; (iv) the three criteria relied upon by Dr. Geier in determining whether an injury is DPT-related are impermissible grounds for a finding of causation; and (v) Dr. Hurst provided the only persuasive testimony on the causation issue. These objections are related and, in sum, amount to an attack on Dr. Geier's expertise and on the study upon which his opinion was principally based.

### A

The government launches a three-pronged attack on Dr. Geier's opinion that if a neurologically intact child suffers a seizure disorder within seven days of a DPT vaccination, then in the absence of an alternative explanation the seizure disorder was more likely than not caused by the vaccine.

First, the government says that Dr. Geier, who is not a neurologist, is not competent to make the threshold determination whether a child was neurologically intact prior to vaccination. However, Dr. Geier relied on Angel's medical records, not his own examination, for his conclusion that Angel was neurologically intact prior to vaccination, and in any event, the government does not allege that Angel had a neurological disorder prior to May 2, 1985.[4]

Second, the government says that Dr. Geier's reliance on an initial manifestation of an injury within seven days of vaccination impermissibly relies on a mere similarity to the time period listed in the Vaccine Injury Table (three days) as evidence of causation. *See* H.Rep. 99–908, 99th Cong., 2d Sess. 15 (1986) (reprinted in 1986 U.S.

---

**3.** The government's first objection reads: "Petitioner has the burden to establish by a preponderance of the evidence that DPT caused infantile spasms in this case." This proposition is beyond debate. We have restated the government's first objection in light of the argument it makes in its brief.

**4.** The government suggests that petitioner must show by a preponderance of the evidence that Angel was neurologically intact prior to May 2, 1985. However, requiring petitioner to make such a showing would amount to imposing a presumption that a child who exhibits a neurological disorder following DPT vaccination was not normal prior to vaccination. Any presumption should be precisely the opposite. Since the government bears the burden of proving that a neurological condition was due to a factor unrelated to a vaccine, 42 U.S.C. § 300aa–13(a)(1)(B), there is an implicit presumption in favor of the petitioner that a child is normal prior to the vaccine.

Code Cong. & Admin.News 6287, 6344, 6356) (in the case of an injury appearing outside the time period set forth in the Vaccine Injury Table, "[s]imple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation ...").

This argument isolates one criterion for Dr. Geier's determination that a given injury was more likely than not caused by DPT vaccination—injury within seven days of vaccination—and suggests that this single criterion is the sole basis of Dr. Geier's conclusion. Dr. Geier did not rely on simple similarity to a time period listed in the Table. To the contrary, onset of an injury such as Angel's within seven days of vaccination has been shown to be statistically significant in a reputable scientific study on DPT-related injuries. We interpret the admonition against finding causation in the case of "simple similarity" to a time period listed in the Table to mean that a petitioner cannot establish causation by showing, without more, that a child has suffered a Table injury within a time period close to the time period listed in the Table. The drafters of the statute contemplated that where a petitioner does not enjoy the presumption of causation, allegations of causation must be substantiated by expert testimony or scientific studies; petitioner has done exactly that.

The government relies on *Strother v. Secretary of the Dep't of Health and Human Serv.*, 21 Cl.Ct. 365, 369–70 (1990), and *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984). In both cases, the initial factfinder[5] awarded compensation for allegedly vaccine-related injuries; in both cases, the court reversed,

stating that a mere showing of a temporal relationship between vaccination and injury was not conclusive on the question of what caused the injuries sued upon. The government would have us expand the *Strother* and *Hasler* holdings to stand for the proposition that as a matter of law, evidence in the form of a proximate temporal relationship between vaccination and injury is insufficient to show causation.

Neither *Strother* nor *Hasler* makes mention of any expert testimony to the effect that the temporal relationship between vaccination and injury in those cases was statistically significant. *Strother* and *Hasler* thus cannot be read as broadly as the government reads them; the cases do not say that evidence relying on temporal relationships is *per se* not probative, rather, *Strother* and *Hasler* simply say that the *factfinder* is not warranted in concluding that a vaccine caused injury based on a temporal relationship between vaccination and injury if it has not been shown that medical experts would find the temporal relationship to be significant. In *Strother*, petitioners' expert testified that he did not know whether petitioners' child's injuries were due to the vaccine, and a court-appointed expert reported that he did not believe that the vaccine had caused the injuries to petitioners' child. In *Hasler*, the experts for both sides testified that the vaccine *could* have been the cause of the plaintiff's injuries, but the court makes no mention of any expert having opined that the vaccine *was* the cause. *Strother* and *Hasler* thus stand in marked contrast to the present case, in which a competent expert witness offered his opinion (based on his review of the medical records and reputable scientific studies) that the DPT vaccine more likely than not caused Angel's seizure disorder.[6]

---

**5.** *Strother* was brought under the National Vaccine Injury Compensation Program, and was tried to a special master of the Claims Court. *Hasler* was brought under the Swine Flu Program Act, and was tried to a federal district court judge.

**6.** There are additional reasons why *Strother* and *Hasler* should be limited to their facts. In *Strother*, petitioners' child did not manifest a

Table injury until 31 months after receiving a combined measles-mumps-rubella vaccine; Angel manifested a Table injury five days after receiving a DPT vaccine. Further, the Claims Court in *Strother* reviewed the Special Master's decision under the pre–1989 *de novo* standard of review, whereas the present case is governed by the deferential arbitrary, capricious, or abuse of discretion standard. In *Hasler*, the plaintiff filed suit under the Federal Tort Claims Act

Third, the government says that Dr. Geier impermissibly relied on an absence of alternative causation to support a finding of causation. However, this is another attempt to isolate one criterion for Dr. Geier's determination that a given injury was more likely than not caused by DPT vaccination and suggests that that criterion is the sole basis of Dr. Geier's conclusion. Again, the three factors—normality prior to vaccination, onset of injury within seven days of DPT vaccination, and no known alternative cause—must be viewed together, and in light of the NCES, these factors are sound criteria upon which to base a finding of causation.

## B

The government also argues that Dr. Geier's opinion is based on "widely refuted" studies. The special master obviously believed otherwise, and we see no reason to set aside her determination. The NCES has been the subject of some controversy, and Dr. Hurst testified that two physician groups disagree with its findings. However, the special master was aware that the NCES was not universally accepted, *see* SMD at 5 n. 7, but she nevertheless accepted Dr. Geier's opinion based on the study. The special master heard and weighed the expert testimony from both sides, reviewed the literature, and was persuaded by the expert who relied on the NCES.

## C

According to the special master, Dr. Geier "stated his opinion to a reasonable degree of medical certainty that Angel's seizures were caused by the effects of endotoxins, a substance known to be harmful to humans, contained in the pertussis component of the DPT vaccine administered [to Angel on May 2, 1985]." SMD at 4. However, Dr. Geier testified:

(FTCA), 28 U.S.C. § 1346(b), 2671 *et seq.* (in conjunction with the Swine Flu Program Act, 42 U.S.C. § 247b(j)-(k) (1976 ed.)) for injuries allegedly sustained from a swine flu vaccine. The *Hasler* court was bound under the FTCA to resolve the causation question according to the substantive law of the state (Michigan) where the vaccine was administered, whereas the

I do not know the mechanism by which Angel Sumrall was damaged, nor does anybody else....

I didn't say that endotoxin goes through the body and breaches the blood brain barrier and causes specific damage. I told you some of the known effects of endotoxin. Endotoxin is distributed through the body. It can lower the blood brain barrier. It can get in. I don't know that it does in pertussis.... I have no universal theory of how this occurs.... I think that there are too many mechanisms to determine. I have never stated that I know how these things occur, and I don't think anybody knows how they occur.

Transcript at 207–08.

If this were the extent of Dr. Geier's testimony, we would be compelled to set aside the special master's conclusion that petitioner showed by a preponderance of the evidence that Angel's injuries were caused by the DPT vaccination. Dr. Geier stated that neither he nor anyone he knows of has demonstrated the mechanism by which DPT vaccines cause neurological injury; his endotoxin theory is speculative.

Even if the special master had a basis for accepting Dr. Geier's theory that endotoxin in DPT vaccines causes injury, there is nothing to indicate that endotoxin caused Angel's disorder. There is no competent evidence in the record that there was a dangerously high level of endotoxin in the vaccine administered to Angel.[7] Dr. Geier stated that many variables affect the level of endotoxin in any particular administration of DPT vaccine, for example, the temperature at which the vaccine is stored and how vigorously the person administering the vaccine shakes the vial before filling the syringe. Further, Dr. Geier explained that there are wide variations in the rate at which the DPT serum disperses through

present case is resolved without reference to state law.

7. Dr. Geier believes that the lot from which Angel's vaccine was derived caused three other injuries, but his testimony on this point was not substantiated.

the body following vaccination, depending on whether the serum is injected into a muscle, a fat pad, or inadvertently into a blood vessel. Therefore, it cannot be established with any degree of certainty that the DPT vaccine administered to Angel contained an inordinately high level of endotoxin, or that the endotoxin in the vaccine dispersed through Angel's body at a slower-than-average rate, thus placing Angel's injury beyond the three-day period in which the legislature believed that most DPT-related injuries were likely to occur. Thus, any conclusion that Angel was injured by endotoxin would not withstand objection.

This is not to say that petitioner has failed to prove causation. In light of other testimony from Dr. Geier, as supplemented by the copious medical literature in the record, we cannot say that the special master's decision on the causation issue was arbitrary or capricious. Dr. Geier offered his opinion on two distinct issues, one of which—his theory that endotoxin in DPT vaccines causes neurological injury—may be considered to be within his field of expertise but was, for the reasons given above, not probative on the causation issue.

However, Dr. Geier also testified that based on his review of Angel's medical records and his thorough familiarity with the literature on DPT-related injuries, it was more likely than not that Angel's seizure disorder was caused by the DPT vaccination. He stated that of all previously normal children who developed a neurological injury within seven days of a DPT vaccination and for whom there was no known alternative cause, all but a very small number of injuries would be attributable to DPT, but it could not be said which cases were unrelated to DPT. Dr. Geier emphasized that he was not testifying that he knew to a certainty that DPT caused Angel's injury, but rather, in light of his three criteria,[8] that it was more likely than not that DPT caused Angel's injury. The factfinder accepted this opinion, so the peti-

tioner has met his burden of proof. Preponderance of the evidence means that evidence which is more credible and convincing to the mind or which best accords with reason and probability. (For other formulations of the preponderance standard, *see* Black's Law Dictionary 1182 (6th ed. 1990)).

**D**

Dr. Geier was qualified to render an opinion based on his review of Angel's medical records and on his knowledge of the literature on DPT-related injuries. Angel's condition, as evidenced by her medical records, is not in dispute. Further, Dr. Geier's knowledge of the medical literature was amply demonstrated at the hearing. Although cast in terms of an attack on Dr. Geier's qualifications, at bottom, the government's challenge to Dr. Geier's testimony is directed at the weight to be given to it. The special master explained:

> [R]espondent argues that because Dr. Geier is not a practicing neurologist or pediatrician, his opinion must necessarily be discounted and that of Dr. Hurst, a treating pediatric neurologist, must be given greater weight. If the question in this case involved the nature of Angel's symptoms, or whether those symptoms were in fact seizures or evidence of encephalopathy, the court would agree that Dr. Hurst is more qualified.... Such is not the case here. No question exists as to the nature of the symptoms or that Angel suffered a seizure disorder. The question is whether it is more likely than not that the seizures were caused by the vaccine. In this regard, Dr. Geier's expertise, based on his experience in empirical vaccine research, epidemiological studies, and his knowledge of the medical literature, is highly relevant and credible....

SMD at 8.

We may not disregard the special master's determination, based on her observa-

---

**8.** Dr. Geier's three criteria for establishing vaccine-relatedness are that the child be neurologically intact prior to vaccination, that the child manifest neurological damage within seven

days of a DPT vaccination, and that there be no known alternative explanation for the child's condition.

tion of the witnesses and her review of the relevant literature, that Dr. Geier's testimony was more persuasive than that of Dr. Hurst. Studies such as the NCES are valid bases upon which a doctor could conclude that a given factor more likely than not caused a given injury. Dr. Geier made clear that in the case of DPT vaccines, many doctors rely on statistical studies to determine whether a given injury was vaccine-related, within a reasonable degree of medical certainty.

### E

Finally, as to the government's assertion that Dr. Hurst provided the only persuasive testimony on the causation issue, we note that Dr. Hurst testified that he did not know the cause of Angel's seizure disorder. The government bears the burden of showing by a preponderance of the evidence that Angel's injuries are due to a factor unrelated to the vaccine, *Matthews v. Secretary of the Dep't of Health and Human Serv.*, 18 Cl.Ct. 514, 518–19 (1989), and a "factor unrelated to the vaccine" does not include unexplained or unknown injuries or conditions. 42 U.S.C. § 300aa–13(a)(2)(A). Hence, Dr. Hurst's testimony on the causation issue, though probative, was not persuasive in the eyes of the special master.

### VII

Respondent's objections to the special master's decision are overruled. The Clerk shall enter judgment for petitioner in accordance with the special master's January 10, 1991 decision.