Megan Elaine SHARPNACK, a minor By and Through John SHARPNACK and Sherry Sharpnack, her Parents and Natural Guardians, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–983V.

United States Court of Federal Claims.

Jan. 8, 1993.

Curtis R. Webb, Twin Falls, ID, attorney of record, for petitioner.

Alfonso J. Montano, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## ORDER

KENNETH R. HARKINS, Senior Judge:

Respondent seeks review in the now United States Court of Federal Claims, under the National Childhood Vaccine Injury Compensation Program (the Program) of determinations made by a special master in a bench ruling on December 3, 1991, a published decision filed June 29, 1992, and a published amended decision filed July 28, 1992.

The Program was established in 1986 as part of the National Childhood Vaccine Injury Act, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3758. Amendments in 1987, 1988, 1989, 1990, and 1991 changed substantially procedures applicable to the functions of special masters, and review of decisions of special masters. Provisions governing the Program, as amended, are contained in 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West 1991 & Supp. 1992). For convenience, further reference to the Program in this order will be to the relevant subsection of "42 U.S.C.A. § 300aa–____."[1]

Petitioners claim that a diphtheria-tetanus-pertussis (DTP or DPT) vaccination on February 19, 1988, caused a residual seizure disorder which has resulted in physical disabilities and diminished mental capacity. Symptoms of the residual seizure disorder were first manifest on February 24, 1988, 6.3 days after administration of the vaccine, and the claim was pursued as an off-Table case. The special master's decisions determined both entitlement and the amount of compensation payable under the Program. Respondent does not challenge the compensation portion of the special master's decisions.

During the proceedings, the special master gave special attention to the credibility and usefulness of the British National Childhood Encephalopathy Study (NCES), and examined recent medical literature and vaccine decisions that reflect controversy over reliance on NCES to support causation in off-Table DPT cases. The special master found that petitioner's injuries were not caused by factors unrelated to the vaccine. The special master also found, in part by reliance on NCES, it was more likely than not that petitioner's injuries were caused by the vaccine.

In *Sumrall v. Secretary of the Dep't of Health & Human Servs.*, 23 Cl.Ct. 1, 6 & 8 (1991) another judge of this court upheld the special master's reliance on the NCES, notwithstanding it was the subject of controversy, and stated: "Studies such as the NCES are valid bases upon which a doctor could conclude that a given factor more likely than not caused a given injury." In *Cucuras v. Secretary of the Dep't of Health & Human Servs.*, 26 Cl.Ct. 537, 540 & 543 (1992), the author of this order described the NCES as a "limited study" of vaccine reaction conducted in Great Britain in the 1970s, and stated that it included "outdated" information and statistics, and

---

**1.** The Health Insurance, Health Promotion, and Vaccine Injury Compensation Amendments of 1991, Pub.L. No. 102–168, 105 Stat. 1102 (Nov. 26, 1991) amended Section 12(g)(2) which requires notice to a petitioner when the Claims Court fails to enter a judgment on a petition within 420 days, exclusive of suspension and remand periods. This order constitutes notice to petitioners pursuant to Section 12(g)(2), as amended.

"outmoded 1970s data." In *Sumrall,* the special master relied upon the medical expert and the NCES; in *Cucuras,* a different special master rejected the opinion of the same medical expert, and gave little weight to any usefulness in the NCES.

Respondent argues numerous reasons to support the contention the special master's decisions should be vacated. These include: (1) legal error as to the meaning of "caused by" in Section 11(c)(1)(C)(ii)(II) of the Program; (2) arbitrary and capricious use of the NCES; and (3) abuse of discretion in: (a) procedures that prevented cross-examination of an expert witness, (b) use of medical literature not introduced by the parties, discussed by their experts or addressed in post hearing briefs, and (c) refusal to reopen record to receive additional expert testimony. The crux of respondent's challenge, however, is alleged worthlessness of the NCES and its use as an element in a decision on causation in an off-Table case.

Respondent's criticism of the special master's decisions concentrates on scientific deficiencies in the NCES and does not take into account the unique role of the special master in the Program, as well as the factors additional to the NCES that influenced the entitlement decisions. In this case, each of the special master's decisions reflect a searching and rational attempt to evaluate the status in current medical opinion of the validity and usefulness of the NCES to show causation in the Program. Neither in this case, nor in the *Sumrall* and *Cucuras* cases, was the NCES the entire basis for a special master's decision. In each of these cases, the special master's particular decision on entitlement involved the weighing of expert opinion, medical records, and the multitude of facts specific to the particular case involved, in addition to evaluation of the NCES.

The responsibilities and functions of special masters in the Program's amended procedures are unique. The 1989 Amendments established a separate office of special masters within the Court of Federal Claims, administered by a chief special master, and gave that office special authority and considerable administrative independence in decisions on claims for compensation under the Program. Section 12(c). The 1989 Amendments directed promulgation of separate rules for special masters, and established specific criteria the rules were to contain (Section 12(d)(2)). Standards were established for conduct of proceedings on a petition (Section 12(d)(3)(B)). Review of a special master's decision by the Court of Federal Claims is expected to be an exceptional occurrence rather than a routine procedure.

■ Review of a special master's decision in the Court of Federal Claims is of a very limited nature. This court may not set aside any findings of fact or any conclusion of law of the special master unless such findings of fact or conclusion of law are "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Section 12(e)(2)(B). In the absence of such findings, this court either must uphold the findings of fact and conclusions of law and sustain the decision or remand the petition to the special master for further action in accordance with the court's directions. Sections 12(e)(2)(A) and (C).

■ The "arbitrary and capricious" test in Section 12(e)(2)(B) is a highly deferential standard of review. "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Secretary of the Dep't of Health & Human Servs.,* 940 F.2d 1518, 1528 (Fed.Cir.1991).

■ The Court of Federal Claims may not substitute its own judgment for that of the special master. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). The special master's decision must articulate a rational connection between the facts found and the choice made. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). "Arbitrary and capricious" includes decisions where the

special master has relied on factors which Congress has not intended to be considered, or has entirely failed to consider an important aspect of the problem, or has offered an explanation of the decision that runs counter to the evidence, or is so implausible it could not be ascribed to a difference in view or a product of expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

■ Respondent contends that the standard applicable to a review of a special master's findings of fact differs from the standard applicable to a review of a special master's conclusions of law. Respondent argues, that while the special master is afforded substantial discretion in resolving issues of fact, questions of law are subject to de novo review. Respondent's contention is contrary to the language of the statute, and it puts an erroneous gloss on the standard established in Section 12(e)(2)(B). When this court reviews a special master's decision, the standard of review for both conclusions of law and for findings of fact is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

■ In *Munn,* the CAFC explicitly defined the standard to be employed when a special master's conclusions of law and findings of fact are reviewed:

> When a case comes before us in which the Claims Court has upheld the findings and conclusions of the special master against a charge that they were arbitrary and capricious, and the Claims Court has rendered judgment accordingly, it follows that the Claims Court's judgment is entitled to at least the same deference by us as that accorded the special master by the Claims Court. That is, we may not disturb the judgment of the Claims Court unless we find that judgment to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Munn v. Secretary of the Dep't of Health & Human Servs.,* 970 F.2d 863, 870 (Fed. Cir.1992); *see also* 970 F.2d at 871, n. 11.

The NCES is a case-control study of the relationship between pertussis vaccine and encephalopathy. The NCES addressed cases of serious acute neurologic illness in children ranging from ages 2 to 35 months based on data from 2 million doses of vaccine administered in England, Scotland and Wales between 1976 and 1979. Neurologic illness was defined as seizures, encephalopathy, or encephalitis. The special master summarized conclusions relative to permanent brain damage as follows:

> One thousand one hundred eighty-two (1,182) cases met the criteria. Following exclusion of infantile spasm cases, 904 cases remained. Thirty (3.3%) had received a vaccination within 7 days prior to onset of the illness. The study found these figures to be statistically significant. Compared to the control group, investigators estimated attributable risk of injury to be one case per 140,000 pertussis immunizations and risk for *permanent* brain damage in previously normal children to be one in 330,000.

The NCES did not propose a mechanism by which DPT causes neurological injury. The special master noted that the NCES team does assert:

> The conclusions of the NCES did not claim that the results *establish* that pertussis vaccine causes permanent brain damage. It was cautiously concluded that they *suggested*, but did not prove, that the vaccine causes the development of potentially damaging, serious neurological disorders in a small number of children who were previously apparently neurologically normal, and not all children with such illnesses recover.

Although it is based on 1976–79 data that may be characterized in 1993 as "outdated" or "outmoded", the NCES is still the most comprehensive study available. The 1991 Institute of Medicine Report, *Adverse Effect of Pertussis and Rubella Vaccine,* (IOM Report), which was submitted by respondent as part of its criticism of the NCES, is not a source of new or additional information. The IOM Report involved no independent research and is limited solely to a review of medical literature. The NCES, however, is too small to provide the

level of proof medical science requires to establish permanent damage. Because permanent injury is so rare, a definitive epidemiological case-control study would require a base as large as the entire U.S. population.

The special master conducted an extensive review of the medical literature that criticized the methodology and the statistical analysis in the NCES. The IOM Report accepted NCES results that suggested increased risk of neurological injury within 7 days, but found that evidence of related permanent damage to be inconclusive. On the basis of a comprehensive review, the special master made the following conclusions:

> Critics have succeeded in projecting a note of caution as to the NCES but have not successfully discredited it. They readily acknowledge that it has epidemiologic value, *to wit,* establishing risk for acute neurological illness within 7 days— in other words, *temporary* neurological illness. As petitioners argue, however, we know that acute neurologic illness can cause permanent neurological deficits. There is no evidence to suggest that the outcome of serious neurologic illness in vaccine associated cases is likely to be different from those caused by other factors.... The risk estimates for permanent neurological illness are indeed "fragile." IOM Report at 106. They are, however, the best figures we have at the present time. The court notes that under guidelines established for pediatric practice in the *Report of the Committee on Infectious Disease* (1988) an encephalopathy within seven days is an "absolute contraindication" to future administration of the vaccine.... The NCES study is consistent with current guidelines in this regard. The court concludes, therefore, that the NCES remains the most reliable estimate of risk that learned science has been able to provide.

■ Petitioner was administered DTP, a vaccine that is on the Vaccine Injury Table, and suffered residual seizure disorder, an injury that is set forth on the Table. Inasmuch as the injury was outside the 3–day

statutory time frame, petitioner must show by a preponderance of the evidence that the injury was caused by the vaccine. Section 13(a)(1)(A). *Grant v. Secretary of the Dep't of Health & Human Servs.,* 956 F.2d 1144, 1147–48 (Fed.Cir.1992). Causation in fact is not shown by a similar injury within a time period close to the 3–day period on the Table. Petitioners are required to provide evidence in the form of scientific studies or expert medical testimony. *See* H.R.Rep. No. 99–908, 99th Cong., 2nd Sess. 15 (1986) (reprinted in 1986 U.S.C.C.A.N. 6287, 6344, 6356). Off–Table cases require proof of a logical sequence of cause and effect, backed by peer reviewed reputable scientific and/or medical literature.

The special master's analysis of the NCES establishes it is a reputable scientific statistical study. The NCES is a statistical analysis of probabilities that indicate when permanent injury could result. Probability analysis does not have direct application in any particular case and it does not establish that a permanent injury would occur to any specific individual. The medical literature in this record makes it clear that there is vigorous dispute as to the relationship of pertussis vaccine to permanent injury. There are varying scientific interpretations, any of which reasonably can be held to relate to a particular case. The special masters, in the Program, have discretion to evaluate the utility of the NCES differently in the light of all facts relevant in a specific claim. Such variations in the analyses of the special masters are within Program standards.

In this case, the special master acknowledged that the NCES does not have universal support, and in some respects is subject to valid criticism. The special master concluded, however, that the NCES finding, that a "significant statistical relationship between the DPT vaccine and neurological damage up to seven days," was not subject to disagreement in the medical community. After considering the criticism and both expert's opinions regarding the NCES, the special master felt that the NCES was still the best and most reliable study to date. The NCES is a valid basis on which a medical expert could conclude that DTP

vaccine more likely than not could cause permanent injury.

██ In addition to evidence provided through scientific studies, causation in an off-Table case, for purposes of the Program, is shown through a complex of other factors: expert opinion, facts specific to the particular claim, and the absence of alternative etiologies. The special master's decision on entitlement involved examination of the other factors in this complex. The special master relied heavily on the expertise and opinion of petitioner's medical expert, Dr. Slater. Dr. Slater stated that the NCES did not prove causation in fact, and that he did not use it in such manner. Rather, he employed the NCES as only one element of several which went into the formulation of his theory of causation. Based on his professional experience, Dr. Slater found that a causal relationship between the pertussis vaccine and permanent neurological damage existed in petitioner's case.

██ In addition to finding causation in fact, the statute requires the special master to find also that "there is not a preponderance of the evidence that the ... injury ... is due to factors unrelated to the administration of the vaccine." Section 13(a)(1)(B). The Vaccine Act requires a separate finding regarding alternative etiologies. *Grant v. Secretary of the Dep't of Health & Human Servs.*, 956 F.2d at 1149. In this case, the special master satisfied this element of the complex, and considered whether petitioner's injuries were caused by any etiology other than the DPT vaccine. Based upon the record, the special master ruled out alternative etiologies for petitioner's injuries. These alternative etiologies included: pneumonia, bronchitis, microcephaly, Rhett Syndrome, glucose transport problems, benign febrile seizures and viral meningitis.

The special master emphasized that the NCES was only support "in addition" to the testimony of petitioner's medical expert. The analysis indicates that the special master rendered his ultimate decision after consideration of the briefs submitted, the relevant medical literature, and testimony of experts in the record. The special master's decision on entitlement accorded with the statutory requirements.

Respondent argues that in a case where the injury occurs outside the Table time limits, a petitioner must prove causation in fact using the same standard that would apply in traditional tort litigation, *i.e.*, proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. Respondent would require proof of the mechanics of how specific pertussis toxins that were contained in the shot administered to the petitioner on February 19, 1988, worked to cause the injury experienced by this particular petitioner. There is nothing in the statute that requires application of traditional tort litigation standards of proof. Such a concept would be an anomaly in this Program that seeks to provide a substitute system of compensation for vaccine injury in lieu of traditional tort litigation. It is in keeping with the objectives of the Program to conclude that a showing that the injury more likely than not was caused by the vaccine is adequate to establish causation in fact.

Respondent contends that the admission in evidence of testimony previously given in the *Sumrall* case by the medical expert in that case, and the special master's use of information in articles in the medical literature that had not been introduced by the parties, discussed by their experts or addressed in post hearing briefs, amounts to prejudicial error. Respondent complains that it was unable to cross-examine the expert as to the facts of this petitioner's case and that there was no opportunity to address the two medical articles.

The special master's use of the two articles in the amended decision was for additional support in the conclusion on the NCES. The articles are not basic to the special master's decision, and in fact, provide only minor support. Respondent had more than adequate opportunity to focus on infirmities in the NCES.

The respondent's complaint concerning the special master's admitting the transcript testimony that the medical expert gave in *Sumrall* is without merit. The

testimony was relevant to an assessment of the NCES, there had been extensive cross-examination of the expert in *Sumrall,* and respondent's attack on the medical expert had been examined by the court in *Sumrall* and there found to be non-persuasive.

The special master afforded both parties ample opportunity to address the NCES by testimony, medical literature, and argument. The special master's use of the medical articles and the transcript testimony of the medical expert in *Sumrall* complied with the relaxed procedures special masters are authorized to use in the Program. Any procedural error, at most, was harmless in the light of all of the other factors that were considered, and which entered the special master's decisions on entitlement. The decision making process employed by the special master was reasonable. Contrary to respondent's assertions, it was not so unorthodox as to transform the proceeding into an arena where gamesmanship is more important than justice.

On the basis of the record of this case, respondent has not shown that the special master's findings of fact and conclusions of law are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, the findings of fact and conclusions of law of the special master are upheld and the decision is sustained. The Clerk is directed to enter judgment in accordance with the decisions of the special master.