John CUCURAS and Maria Cucuras, Parents and Next Friends of Nicole Cucuras, Petitioners,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. C–91–994V.

United States Claims Court.

July 10, 1992.

538

Jack Gage, Cheyenne, Wyo., Atty. of Record, for petitioners.

Vincent J. Matanoski, with whom was Asst. Atty. Gen., Stuart M. Gerson, Washington, D.C., for respondent.

## ORDER

HARKINS, Senior Judge:

Petitioners, on behalf of their daughter Nicole Cucuras, seek review in the United States Claims Court under the National Vaccine Injury Compensation Program (the Program) of a special master's unpublished decision, filed December 30, 1991, that followed a bench ruling on November 22, 1991. For convenient reference, the special master's decision and bench ruling are attached to this order.

The Program was established in 1986 as part of the National Childhood Vaccine Injury Act, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3743, 3758. Amendments in 1987, 1988, 1989, 1990, and 1991

changed substantially procedures applicable to the functions of special masters, and review of decisions of special masters. Provisions governing the Program, as amended, are contained in 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West 1991 & Supp.1992). For convenience, further reference to the Program in this order will be to the relevant subsection of "42 U.S.C.A. § 300aa——."[1]

Nicole Cucuras was born on February 9, 1989, at Mansfield General Hospital, Mansfield, Ohio.

On February 26, 1989, she experienced a choking episode. Petitioners called the rescue squad and had Nicole admitted to Mansfield General Hospital. Nicole was observed overnight and released the next day with an apnea monitor.

Nicole received her first DTP vaccination on Saturday, April 8, 1989.

The record is ambiguous as to events between the vaccination on April 8, 1989, and the next visit to the pediatrician on May 5, 1989. In their affidavit filed with the petition and in their testimony, petitioners state Nicole cried inconsolably on the night of the vaccination and began a high-pitched scream. On April 9, 1989, petitioners allege, Nicole began movements that were described as jerks and startle-type reactions. By Friday, April 14, 1989, these movements were worse, and a telephone call was made to the pediatrician's office, during which the nurse relayed a message from the doctor that babies startle easily and the parents should not worry. A written record of this telephone conversation was not made.

On May 5, 1989, Nicole was taken to her pediatrician for a regular checkup. The medical records describe her condition as "startles easily," "hand thumping," "vomiting and choking easily." The pediatrician, according to petitioners' testimony, said the actions were "a startle reflex" and they were not "to worry about anything." Her condition appeared to be within normal limits.

On May 7, 1989, Nicole awoke from her sleep, stiffened, and started gasping for breath. Petitioners called the rescue squad who transported Nicole to Mansfield General where she was admitted. An electroencephalogram (EEG) performed on May 8, 1989, was abnormal, suggesting "the potential for focal and generalized seizure disorder." A CT scan of the head performed the following day was normal.

Diagnosis and treatment of Nicole's seizures after the vaccination involved three hospitalizations: Mansfield General Hospital, May 7–10, 1989; Columbus Children's Hospital, May 10–27, 1989; and Cleveland Clinic Foundation, July 4–12, 1989. Petitioners first learned that a seizure disorder was involved when she was at Mansfield General.

At each hospitalization, medical history statements were prepared on the basis of information provided in part by petitioners. These statements are part of the medical records. The medical records contain items that are inconsistent, or conflicting, with regard to information relating to the onset of Nicole's seizure-like activity.

In addition to ambiguities as to the onset of seizure activity, the medical records reflect diagnoses of infantile spasms and hypsarrhythmia, hypertension and a mild diffuse encephalopathy. Expert witnesses from both parties agree with the diagnosis of infantile spasms. Nicole's seizure disorder continues, and it is intractable to anticonvulsant medication. She has been prescribed Mogadon, Phenobarbital, Depacote and ACTH. Her development continues to be delayed.

On March 7, 1991, petitioners filed a claim under the Program alleging that Nicole suffered a residual seizure disorder and an encephalopathy following the DTP

---

1. The Health Information, Health Promotion, and Vaccine Injury Compensation Amendments of 1991, Pub.L. No. 102–168, 105 Stat. 1102 (Nov. 26, 1991) amended Section 2112(g)(2) which requires notice to a petitioner when the Claims Court fails to enter a judgment on a petition within 420 days, exclusive of suspension and remand periods. In this case the 420 day period expired July 1, 1992. This order constitutes notice to petitioners pursuant to Section 2112(g)(2), as amended.

vaccination on April 8, 1989, "within the time set forth in the Vaccine Injury Table."

Trial was held on November 22, 1991. The theory of the case was alternatively pleaded, but it was principally presented as a "Table Case," where causation of Nicole's disorder would be presumed if onset occurred within 72 hours of vaccination.

At the start of the trial, the special master commented on the state of the medical records. His statement included:

> The reason that we are holding this hearing today is because in reviewing the records, it was my impression that the most specific references to onset of seizure activity dated the onset to about a week after the DPT shot. That would not make it a table injury and would raise serious questions about actual causation.

> There is a rule of law which is applied generally, and which has been applied by this Court to Vaccine Act cases, which says that, generally speaking, written documents, written records, particularly contemporaneous records, are entitled to greater weight than oral testimony. There are exceptions to that rule and the Court needs to hear the testimony to see whether it is persuaded that, notwithstanding the references, particularly the early records, to a later date of onset, that the seizures actually commenced, as the parents have alleged, on the day following the DPT vaccination.

> So, the Court is going to listen carefully and then we will have to make a determination as to whether it should apply the general rule, which is to give greater weight to the written records, or whether the parents have overcome that by showing that those written records do not accurately reflect what happened. So your testimony is important to me.

After the trial, the special master found there was not a preponderance of the evidence that Nicole sustained a seizure disorder within the three day time period. This finding was based on the conclusion that the evidence in the written medical records was too strong to be overcome by contrary testimony of the parents. The special mas-

ter also concluded that Nicole's present condition had not been shown by a preponderance of the evidence to be caused by the vaccine.

In reaching his decision on causation, the special master gave greater weight to the report of the National Academy of Sciences, Institute of Medicine (IOM Report), than he gave to the testimony and opinion of petitioners' experts. The IOM report concluded: "The evidence does not indicate a causal relation between DPT vaccine or the pertussis component of DTP and infantile spasms."

The IOM report was a product of an investigation authorized by Congress when the Program was established in 1986. Section 312(e) of Public Law 99–660 provided that the Institute of Medicine should investigate, *inter alia*, the relationship between pertussis vaccine and infantile spasms. That study, done by the Division of Health Promotion and Disease Prevention, Institute of Medicine, is contained in the section captioned "Evidence Concerning Pertussis Vaccines and Central Nervous System Disorders, including Infantile Spasms, Hypsarrhythmia, Aseptic Meningitis, and Encephalopathy." The investigation was completed in 1991.

Petitioners' expert based his opinion on out-dated information and statistics gathered in the National Childhood Encephalopathy Study (NCES). The NCES was a limited study of vaccine reactions conducted in Great Britain in the 1970s.

Petitioners raise the following specific objections to the special master's decision:

1) The Special Master committed an overt error of law in applying a doctrine which he compared to a "statute of frauds," creating a presumption against the veracity of parents, and assigning greater evidentiary weight, as a matter of law, to inconsistent medical records.

2) The Special Master acted in an arbitrary and capricious manner, which is contrary to law, by ruling, in the absence of supporting testimony, the judicially— noticed medical "literature" would overcome the petitioners' expert medical testimony.

3) The Special Master arbitrarily and capriciously selected certain medical records as dispositive evidence of the date of seizure onset, contrary to the great weight of the evidence, and in the presence of internal inconsistencies in the records chosen.

### Standard of Review

■ A special master's decision may not be disturbed by the Claims Court unless the court finds it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The 1989 Amendments defined the Claims Court function in a review of a special master's decision in Section 2112(e)(2), as follows:

(2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

The report of the Conference Committee on the 1989 Amendments emphasized that an appeal to the Claims Court was to be "under very limited circumstances." The report states:

The Conferees have provided for a limited standard for appeal from the master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

H.R.Conf.Rep. No. 101–386, 101st Cong., 1st Sess., at 517, *reprinted in* 1989 U.S.Code Cong. & Admin.News 3112, 3120.

■ This limited scope of review is tailored to the concepts and objectives of the Program. The standard "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" is based on one of the criteria established by the Administrative Procedure Act (APA). 5 U.S.C. § 706 (1988). To the extent consistent with Program objectives to be attained through the Office of Special Masters, decisions interpreting the APA standard have application in a review of a special master's decision. Under the APA standard, conclusions of law are considered de novo. *Rice v. Wilcox*, 630 F.2d 586, 589 (8th Cir.1980). On issues of law, recognition should be given to the special master's expertise in the development of the procedures in this novel Program. A decision on issues of law applicable to the Program should be overturned only when error is unmistakenly clear.

■ When the Claims Court reviews a special master's decision, the court is required to engage in a searching and thorough review, but the scope of the inquiry is limited. The Claims Court may not substitute its own judgment for that of the special master. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). The special master's decision must articulate a rational connection between the facts found and the choice made. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). "Arbitrary and capricious" includes decisions where the special master has relied on factors which Congress has not intended to be considered, or has entirely failed to consider an important aspect of the problem, or has offered an explanation of the decision that runs counter to the evidence, or is so implausible it could not be ascribed to a difference in view or a product of expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

The "arbitrary and capricious" test in Section 2112(e)(2)(B) is a highly deferential standard of review. "If the special master

has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Secretary of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed.Cir.1991).

### Disposition

■ Two issues in this case are controlling: 1) the date of seizure onset, and 2) proof that the DTP vaccination caused the seizure disorder. Petitioners have the burden of proof on both issues. The special master's findings of fact and conclusions of law may not be set aside unless a truly arbitrary decision has been made.

■ The special master's assignment of greater evidentiary weight to the medical records then to the testimony of the petitioners did not create a presumption against their veracity nor increase their burden of persuasion. The principle applied by the special master concerned the appropriate weight to be accorded the evidence in the record. It in no way concerned petitioners' burden of proof.

The principle that contemporaneous written documents are entitled to greater weight as evidence than later conflicting oral testimony is well established and long has been recognized by the Supreme Court, the Court of Claims, the Federal Circuit, and this court.

Petitioners argue that this principle flies in the face of general doctrines of compensation law that postulate liberal interpretation of statutory provisions, and that the benefit of the doubt is to be given to a claimant for compensation. This argument is without merit. Nothing in the Program supports the notion that testimony of individuals seeking compensation is entitled to greater weight than contemporaneous medical records. The statute prohibits a special master from finding that compensation is warranted based on petitioners' testimony alone. Section 2113(a)(1).

■ The special master's findings and conclusions must be based on a consideration of the entire record. The evidentiary standard was explained at the start of the trial, and it is clear from that statement that the special master was concerned to hear, and did not fail to consider, the testimony of the petitioners. The evidentiary standard applied by the special master is reasonable, and its application in this case was correct.

■ The special master ruled that "it is impossible to determine the specific date when the onset of seizures occurred." The special master held that, after considering the record as a whole, the onset of seizure activity was a "week or so following the vaccination." Most persuasive to the Special Master were two particular medical records.

The first is the Columbus Children's Hospital record dated May 10, 1989, an entry made four weeks and four days after Nicole's DTP vaccination. The entry is a history of Nicole's illness, with a notation: "Informant-parent-reliable." The entry states, "This is the first CCH admission for this 12 week old white [female] infant with a 2 week history of 'spells'." A two week history of spells would mean seizure onset occurred on April 26, 1989. The second page of this entry states, "DTP and OPV 4 weeks ago (had immunizations 1 week prior to onset of the spell)." If the spells occurred one week after Nicole's DTP vaccination on April 8, 1989, the date of onset would be April 15, 1989.

The second entry which the special master found to be particularly persuasive was in the medical records from the Cleveland Clinic. This entry, which the special master believed was made by Dr. Rothner, says that Nicole was "perfectly well" until one week after the DTP shot. The special master believed that the words "perfectly well" reflected what Dr. Rothner was told by the parents.

Petitioners admit that "the very inconsistency of the medical records make *any* specific choice of record an arbitrary choice." In this case, the written medical records at times are inconsistent. No medical record, however, says that Nicole's seizures began the day after her DTP shot. Most of the references indicate that Ni-

cole's seizures began one week after her vaccination.

The testimony presented by the petitioners did not refute the contemporaneous records or adequately explain why, if the petitioners were certain that Nicole's illness began on the day following her vaccination, they nevertheless reported to medical personnel that she was well until one week after the vaccination. It is clear that petitioners were very concerned with Nicole's health. Nicole was taken to several hospitals and pediatric neurologists to ensure that her condition was properly diagnosed and treated. Petitioners consistently reported that Nicole was perfectly well until a week after her April 8, 1989, DTP vaccination. In light of this concern for Nicole's treatment and petitioners' specific suspicion that the DTP was implicated in causing Nicole's problems, it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred.

The following conclusion of the special master's decision is reasonable: "Overall, I believe that the evidence in the written records to which I referred is too strong to be overcome by the testimony of the parents." The record does not demonstrate that the special master's decision was arbitrary, capricious or an abuse of discretion.

█ The special master concluded that petitioners had not established by a preponderance of the evidence that the DTP vaccination was the actual cause of Nicole's seizure disorder. Petitioners argue that even if Nicole's seizures began a week after her vaccination, Nicole's injuries actually were caused by the receipt of the DTP vaccine. Petitioners contend that the testimony of their expert was sufficient to meet their burden, and the special master's conclusion was contrary to law.

Petitioners are incorrect. Respondent's expert testified that a seizure disorder which arose more than three days after a vaccination could not be caused by that vaccination. Petitioners' other expert also was unwilling to implicate the DTP vaccine as the cause of Nicole's disorder if her disorder first arose more than three days after her vaccination. Only petitioners' "actual causation" expert, was willing to implicate the DTP vaccination as the cause of Nicole's seizure disorder even if her initial seizures began as long as one week after her vaccination. Petitioners' "causation" expert's position was based upon outmoded 1970s' data gathered in the NCES and was refuted by respondent's expert. Furthermore, petitioners' expert acknowledged that the evidence he was presenting to the Court concerning a seven day "window of vulnerability" for adverse reactions to DTP had been presented to and rejected by the IOM during its investigation into adverse consequences of DTP and Rubella vaccinations. The special master considered the IOM report to be persuasive: "[B]ecause of the scope of the IOM study, what its mission was, and the recent date of its issuance, I find it to be authoritative, and I think that it is entitled to a great deal of weight."

The special master had to reconcile conflicting expert testimony. As long as it is reasonable, his choice of respondent's expert opinion over petitioners' experts, and his acceptance of conclusions in relevant medical literature, is within the discretion granted to special masters in the Program.

---

On the basis of the foregoing, after review of the record of this proceeding, the findings of fact and conclusions of law of the special master are upheld and the special master's decision is sustained. The Clerk is directed to enter a judgment in accordance with the decision of the special master.

### ATTACHMENT TO ORDER

### A. MEMORANDUM DECISION

BAIRD, Special Master.

On March 7, 1991, John Cucuras and Maria Cucuras, as parents and next friends

of their minor daughter Nicole Cucuras (hereinafter "Nicole") filed a petition for compensation under the National Vaccine Injury Compensation Program [1] for injuries to Nicole allegedly resulting from a DPT (diphtheria, pertussis, and tetanus) inoculation on April 8, 1989. Respondent appeared and filed a report denying petitioners' entitlement to compensation under the Program.

A hearing on the petition was held in Washington, D.C., on November 22, 1991.

### The Statutory Scheme

Under the Act, there are two separate means of establishing entitlement to compensation. If an injury listed on the Vaccine Injury Table found § 2114(a) of the Act (hereinafter "Table") occurred or was significantly aggravated within the time period prescribed in the Table, then a qualified petitioner is entitled to compensation unless there is a preponderance of evidence that the injury was due to factors unrelated to the administration of the vaccine. Compensation may also be awarded for injuries not listed on the Table or which are listed but occurred outside the time limits of the Table, but entitlement in such cases is dependent upon proof by a preponderance of evidence that the vaccine actually caused the injury complained of. In either case, the residual effects must have persisted for at least six months, and unreimbursable expenses in excess of $1,000 must have been incurred as a result of the injury.

Petitioners have pursued their claims as a Table case. The petition allege that Nicole suffered an encephalopathy and the onset of a seizure disorder within three days following the administration of the DPT vaccine. Both "encephalopathy (or encephalitis)" and "residual seizure disorder" are Table-listed injuries for the DPT vaccine if the first symptoms or manifestations of onset thereof appear within three days following vaccination. Additional requirements for a residual seizure disorder are set out in § 2114(b)(2) of the Act: The petitioner must not have suffered a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees before the first seizure or convulsion following the administration of the vaccine and, within one year after the administration of the vaccine, two or more seizures or convulsions unaccompanied by fever or accompanied by a fever of less than 102 degrees must have occurred.

### Bench Ruling

At the close of the hearing, the undersigned issued a bench ruling, finding that the petitioners had not established by a preponderance of evidence either that a Table injury occurred following the DPT vaccination on April 8, 1989, or that Nicole's present condition was cause by the vaccine.[2]

For the reasons stated in the bench ruling, in the absence of a motion for review filed pursuant to RUSCC Appendix J, the clerk of the court is directed to enter judgment dismissing the petition.

### B. BENCH RULING ON NOVEMBER 22, 1991

The Court: I am going to issue a bench ruling in the case. Let me say first that all of the preliminary jurisdictional requirements have ben met. Nicole did received a DPT vaccine set forth in the table, the DPT vaccine on April 8, 1989—this is a post-Act case—that was received in the United States in Ohio.

She does suffer from a seizure disorder, and has suffered the residual effects for more than six months. And her parents have incurred more than $1,000 in expenses. There has not previously been an award or a settlement of a civil action, which is what would be expected in a post-Act case. And the parents are the appropriate people to bring the petition.

On the issue of table injury, I find that there is not a preponderance of the evi-

---

1. The National Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, as *amended,* 42 U.S.C.A. § 300aa–1 *et seq.* (West 1991).

2. *See* hearing transcript for the text of the ruling.

dence that Nicole sustained an illness, disability, or injury on the table within the table parameters. This is not as clear a case certainly as Murphy was—if it was, there would not be a hearing here today—where the medical records are very clear and consistent, and there is even testimony or evidence that the parents indicated in writing a time inconsistent with what they are claiming now. Nor is this case I think quite as clear as Ponder, another case that I decided, where again the medical records were very consistent.

The medical records in this case are not entirely consistent. And it has been pointed out that there are many entries as to when the onset occurred, and there is a variation. It is impossible to determine the specific date when the onset of seizures occurred.

I find two entries the most persuasive, however, in concluding that the onset was not within three days following the vaccination. Both of these entries involve situations in which neurologists specifically discussed with the parents when the onset of seizures occurred in relation to the DPT shot. The first of those are the records of the Columbus Children's Hospital found at pages 105 and 106 where there is a specific reference that the immunizations were one week prior to the onset of the spells.

And then the second one would be the Cleveland Clinic records, which I believe were taken by Dr. Rothner, and which is reflected in his later letter found at page 362, in which he indicated, this is at page 228, again that the child was perfectly well, and then one week after the DPT shot had the onset of the sudden jerks. I consider it likely that the works "perfectly well" reflect what he was told by the parents.

Some of the contrary evidence is found between pages 244 and 248, which I think that you have to read together. On page 244, it says that the parents first noted the seizures immediately after the first DPT shot. Then you turn over to page 247 and it says under the plan section, ITem 5, "Consult parents further re: DPT immunizations and onset of first seizures, and

consider advising against further immunizations of DPT." And then over on the next page is says, "Patient's mother states seizures started a few days post-DPT shot."

So it is not as specific as it sounds on page 244, if you read it altogether. The best that she can come up with is a few days after, which is clearly inconsistent with the testimony which has been given here today and in the affidavit, that they have specific recall that the seizures started on April 9th, the day after the shot.

Overall, I believe that the evidence in the written records to which I have referred is too strong to be overcome by the testimony of the parents. I am not saying that they are lying or committed perjury. But under the rule, which I referred to at the outset of the hearing, which was adopted to try to minimize the opportunity for people to commit fraud on the Court, which is similar in some as put to the statute of frauds which keeps people from testifying concerning oral contracts over certain amounts, I feel that I must give weight to the medical records, specifically the ones that I referred to.

On the issue of actual causation, I think that the best evidence is, if you consider the records as a whole, that the onset of seizure activity was a week or so following the vaccination.

Dr. Gale said a week to two weeks. I think that is probably a fairly good assessment of the records, if you look at them as a whole. I would say a week or so. That means it could have been a little less than a week. It might have been on the sixth day. It could have been the eight, ninth, tenth, or even out as far as two weeks, depending on how you read them.

The evidence from the Petitioner's experts on actual causation is mixed. Dr. Kinsbourne would not be willing to opine actual causation beyond three days. And Dr. Geier said that he was comfortable opining to seven days. According to the IOM report, which has been referred to here, the medical evidence does not indicate that there is a casual relationship between the DPT vaccine and infantile spasms. The

respondent's expert opined that the medical literature doe not show a causal relationship between DPT vaccine and infantile spasms. The articles cited in rebuttal by Dr. Grier spoke only of possibilities, not probabilities.

Nicole's disorder did first present itself as infantile spasms. And because of the scope of the IOM study, what its mission was, and the recent data of its issuance, I find it to be authoritative, and I think that it is entitled to a great deal of weight.

I conclude therefore that there is not a preponderance of evidence of actual causation in this case. And I would not be able to find that the DPT vaccine actually caused infantile spasms that did not present themselves until a week following the vaccination. So therefore, I find that Petitioners are not entitled to an award of compensation under the Act.