Gretchen **ESTEP, as the Legal Representative of her minor daughter, Trisha Estep, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 90–1062V.**

United States Court of Federal Claims.

June 25, 1993.

Richard A. Schollmann, Torts Branch, Civil Div., U.S. Dept. of Justice, for the respondent, with whom were Charles R. Gross, Asst. Director, Torts Branch, Civil Div., John Lodge Euler, Deputy Director, Torts Branch, Civil Div., Helene M. Goldberg, Director, Torts Branch, Civil Div., and Stuart M. Gerson, Asst. Atty. Gen.

Curtis R. Webb, Twin Falls, ID, for petitioner.

**OPINION**

MARGOLIS, Judge.

In this vaccine case, respondent seeks review of the Special Master Paul T. Baird's decisions of November 3, 1992 and January 26, 1993 awarding compensation for a vaccine-related injury. Respondent challenges the special master's award on the ground that there was no reputable medical or scientific explanation to support a finding that the vaccine caused the injury. After review of the record and after hearing oral argument, the court upholds the special master's decision.

**FACTS**

The basic facts are uncontested. Petitioner's infant daughter, Trisha Estep, re-

ceived a diphtheria, pertussis and tetanus ("DPT") vaccination on July 3, 1985. Several days after the shot, Trisha's behavior changed. She began screaming and crying inconsolably and continued to do so for several months. After the crying commenced, she would not sleep for more than 30 minutes at a time, and she became unresponsive and disinterested in her surroundings. After several months, Trisha's pediatrician noticed delays in her development. She now suffers from permanent neurological sequela, including mental retardation and developmental delays. Petitioner brought this action for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–1 to –34 (1991) ("the Act" or "the Vaccine Act"), alleging that the DPT vaccination caused Trisha to suffer an encephalopathy. After two factual hearings, Special Master Baird found that Trisha suffered from an encephalopathy, the symptoms of which commenced four days after the DPT vaccination, that the DPT vaccine can cause encephalopathies, and that it was more likely than not that the DPT vaccine did cause Trisha's encephalopathy. Accordingly, the special master awarded compensation.

The respondent, the Secretary of the Department of Health and Human Services ("the Secretary"), challenges the award on the ground that the special master failed to find a reputable medical or scientific explanation for Trisha's injury. According to the respondent, the petitioner must prove that a reputable medical or scientific theory supports the assertion that the DPT vaccine can cause chronic encephalopathy. The petitioner argues that her medical experts testified that a reputable medical or scientific theory causally connects the vaccination and the injury, and that it was within the special master's province to credit this testimony.

### DISCUSSION

The Act states that this court may "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). The Court of Appeals for the Federal Circuit explained that this section contains three separate standards of review, each applying to a different aspect of the special master's decision. "Fact findings are reviewed ... under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the 'abuse of discretion' standard." *Munn v. Secretary of Health and Human Servs.*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). The Secretary argues that the special master failed to apply the correct legal standard for demonstrating causation in fact. This is an issue of law; therefore the court reviews it *de novo. Bradley v. Secretary of Health and Human Servs.*, 991 F.2d 1570, 1574 n. 3 (Fed.Cir.1993) (stating "[l]egal conclusions are, of course, always reviewed *de novo* ").

▇▇▇ The Act provides two avenues for establishing that the vaccination caused injury. The first avenue creates a rebuttable presumption of causation if petitioner proves (1) that the injury is listed on the Vaccine Injury Table at section 14(a), and (2) that the first symptom of the injury occurred within the time frame specified for that injury in the Table. 42 U.S.C. § 300aa–11(c)(1)(C)(i). If there is no Table Injury or if the symptoms commence after the time frame in the Table, the second avenue permits the petitioner to show actual causation by a preponderance of the evidence. 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(II).

▇▇▇ Here, the special master found that Trisha did suffer from chronic encephalopathy, which is a Table Injury, but that the initial symptoms did not occur within three days after the vaccination, which is the time frame provided in the Act. *See* 42 U.S.C. § 300aa–14(a). Therefore, the petitioner had to prove actual causation. To prove actual causation, the petitioner had to establish that a reputable medical or scientific theory supported a logical sequence of cause and effect. *Grant v. Secretary of Health and Human Servs.*, 956 F.2d 1144, 1148 (Fed.Cir.1992).

The special master found by a preponderance of the evidence that (1) Trisha suffered an encephalopathy, (2) a DPT vaccination can cause encephalopathy, and (3) Trisha's DPT vaccination caused her encephalopathy. The Secretary claims the special master failed to require the petitioner to prove that there is a generally accepted medical or scientific theory that DPT vaccinations cause chronic encephalopathies.[1] According to the Secretary, the petitioner did not offer evidence of causation based on a theory that is generally accepted in the scientific community. Therefore the special master permitted the petitioner to recover without having to satisfy this element of her claim.

■ Contrary to the Secretary's position, the special master did find that the petitioner offered evidence of a reputable medical or scientific theory of causation. The special master's decision states that:

> [t]he resolution of the question of whether the DPT vaccine can cause chronic encephalopathy is not difficult on this record. All of the expert witnesses agreed with the conclusion ... that the DPT vaccine can cause acute encephalopathy and also agreed that anything that can cause acute encephalopathy has the capability of causing permanent neurologic damage. Thus, there is a preponderance of the evidence in this case that DPT vaccine can cause chronic encephalopathy.

*Estep v. Secretary of Health and Human Servs.*, No. 90–1062V slip op. at 9, 1992 WL 357811 (Fed.Cl. Nov. 3, 1992) (special master's order granting compensation) (citations omitted). This language shows that the special master did find that there is a reputable medical or scientific theory that DPT vaccinations can cause chronic encephalopathies. Thus, he did use the correct legal standard for establishing causation in fact.

To reach the conclusion that there is a reputable medical or scientific theory that DPT vaccinations can cause chronic encephalopathies, the special master relied on the testimony of three expert witnesses, including the Secretary's expert. Dr. Mark R. Geier testified that Trisha suffered an encephalopathy, the symptoms of which commenced four days after the DPT vaccination. Dr. Geier further testified that DPT vaccinations can cause chronic encephalopathies, and he based his opinion on case reports, animal tests, known biological properties of the bacterium which causes pertussis, controlled case studies including the National Childhood Encephalopathy Study ("NCES"), and data collected under the Monitoring System for Adverse Events Following Immunization.

Another expert, Dr. Thomas A. Schweller, also supported the theory that DPT vaccinations can cause chronic encephalopathies. He testified that it is known that DPT vaccinations can cause acute encephalopathies and that anything which can cause an acute encephalopathy can also cause chronic neurologic damage. He also agreed that Trisha suffered an encephalopathy but testified that the first symptoms of her encephalopathy occurred within three days of the vaccination. The Secretary's expert, Dr. Joel Herskowitz, also agreed that evidence suggests that the DPT vaccinations can often cause acute encephalopathies and that most things that can cause acute encephalopathies can also cause chronic encephalopathies. This portion of his testimony tends to support Dr. Geier's theory of causation. Dr. Herskowitz, however, did not agree with the two other experts' conclusion that Trisha's injury was an encephalopathy.

While the experts disagreed as to whether and when Trisha actually suffered an encephalopathy, they did agree that anything which can cause acute encephalopathy can also cause permanent neurologic damage. *Id.* Their testimony, plus the data on which it was based, is sufficient evidence upon which a reasonable factfinder could find that there is a reputable

---

**1.** The Secretary appears to concede that there was sufficient evidence in the record to support a finding that DPT vaccinations can cause *acute* encephalopathies; the Secretary challenges the finding that DPT vaccinations can cause *chronic* encephalopathies. Estep seeks damages for chronic encephalopathy.

medical or scientific theory supporting a finding of causation.

The Secretary makes much of the fact that one study, known as the Institute of Medicine Report ("IOM Report"), found that there is "insufficient evidence to indicate a causal relation between DPT vaccine and permanent neurologic damage." *Id.* at 7. The special master considered the IOM Report but found it inconclusive on the question whether DPT vaccinations can cause *chronic* encephalopathies; the Report's conclusions were consistent with a causal relation between the DPT vaccination and *acute* encephalopathies. The special master also expressed concern that the authors of the IOM Report used a higher standard than necessary.

It is within the special master's province to determine whether, based on a preponderance of the evidence in the record, a reputable medical or scientific theory supports a finding of causation. The Act does not require him to accept the IOM Report as dispositive of the question. To the contrary, the Act affords the special master considerable discretion to weigh the evidence. The Act specifies that proceedings are to "include flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa–12(d)(2)(B). In weighing the evidence, the special master must "articulate a satisfactory explanation for [his] action including a 'rational connection between the facts found and the choice made.'" *Hines v. Secretary of Health and Human Servs.,* 940 F.2d 1518, 1528 (Fed.Cir.1991) (citation omitted). Here, the special master did not ignore the IOM Report, but simply assigned it less weight than other evidence. The court finds that the special master did articulate a satisfactory explanation for the weights he assigned.

The court also rejects the Secretary's arguments with regard to the testimony of Dr. Geier. The Secretary asserts that Dr. Geier's methodology is not generally accepted in the scientific community, because Dr. Geier "opined to a 51% confidence level," and because Dr. Geier has not published his theories, which would subject them to the rigors of peer review.[2] These arguments are unpersuasive because the special master relied not only on Dr. Geier's opinions, but also on other expert testimony plus the case studies on which their testimony was based, to conclude that a reputable medical or scientific theory supported a finding of causation. Based on the testimony of the experts and his review of the literature, the special master concluded that Dr. Geier's methodology was generally accepted in the scientific community. The court finds no basis for disturbing that conclusion.

The court is aware that in previous decisions, special masters have reached varying conclusions as to the probative value of the IOM Report and the NCES. *See Sharpnack v. Secretary of Health and Human Servs.,* 27 Fed.Cl. 457, 459 (1993); *Cucuras v. Secretary of Health and Human Servs.,* 26 Cl.Ct. 537, 543 (1992), *aff'd,* 993 F.2d 1525 (Fed.Cir.1993); *Sumrall v. Secretary of Health and Human Servs.,* 23 Cl.Ct. 1, 6 (1991). Indeed, in *Cucuras,* the same special master as in this case, Special Master Baird, was presented with a conflict of evidence very similar to that in this case. The respondent offered the IOM Report, and the petitioner offered the NCES plus the testimony of Dr. Geier. 26 Cl.Ct. at 543. In *Cucuras,* Special Master Baird came to the opposite conclusion from our case; he concluded that the IOM Report was more persuasive, and Dr. Geier's testimony less persuasive. *Id.* at 543, 545–46.

**2.** The Secretary cites *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 951 F.2d 1128, 1130 (9th Cir.1991), *cert. granted,* —— U.S. ——, 113 S.Ct. 320, 121 L.Ed.2d 240 (1992), for the proposition that epidemiological studies that have neither been published nor subjected to the rigors of peer review are not generally accepted in the medical community. *Id.* at 1130 *Daubert* is unpersuasive because the experts who testified in our case based their opinions on other knowl-

edge aside from unpublished epidemiological studies. Moreover, in *Daubert* the issue was whether the Federal Rules of Evidence required the court to exclude the expert testimony, but the Federal Rules of Evidence do not apply in vaccine cases. Indeed, in vaccine cases, special masters are uniquely qualified to weigh evidence; therefore there is less need to exclude evidence.

It appears, however, that the variety of conclusions reflects the complexities of fact finding in vaccine cases, factual differences, and differences in proof offered in each case. On the record in this case, however, the court finds no basis for disturbing the special master's decision.

Any other arguments as to the soundness of Dr. Geier's conclusions go to the weight to be assigned to Dr. Geier's testimony, not to the appropriate legal standard. The court reviews these conclusions to determine if they are arbitrary or capricious. The conclusions would have been arbitrary and capricious if the special master had "relied on factors which Congress ha[d] not intended [him] to consider, entirely failed to consider an important aspect of the problem, offered an explanation for [his] decision that r[an] counter to the evidence before [him], or [the decision was] so implausible that it could not be ascribed to a difference in view or the product of ... expertise." *Hines*, 940 F.2d at 1527.

The special master's factual conclusions were neither arbitrary nor capricious. Three experts agreed that a DPT vaccination can cause an acute encephalopathy, and that anything that can cause an acute encephalopathy can cause permanent neurologic damage. Dr. Geier's opinion was based on case reports, controlled case studies such as the NCES, animal tests, known biological properties of bacterium causing pertussis, and other data. On this record as a whole, a reasonable person could find by a preponderance of the evidence that a generally accepted medical or scientific theory supported a logical sequence of cause and effect. Though a different factfinder might have assigned greater weight to the IOM Report, "such arguments as to the weighing of evidence, particularly where, as here, witness credibility is involved, do not demonstrate reversible error." *Hines*, 940 F.2d at 1527.

## CONCLUSION

The court finds that the special master did use the correct legal standard for establishing causation and that his factual findings were neither arbitrary nor capri-

cious. Accordingly, the special master's decisions are affirmed. The Clerk shall enter judgment for the petitioner.